BRYANT v. MUTUAL BEN. LIFE INS. CO.

(Circuit Court, M. D. Tennessee. May 11, 1901.)

1. LIFE INSURANCE—POLICY—PREMIUM—FORFEITURE—RECEIPT FOR LOAN.

A life policy provided that, if any premium was not paid when due, the policy should determine, except that it should continue in force for such length of time as the net reserve then accrued thereon would pay for, after payment of any loan made by the company to the insured. The insured afterwards borrowed from the company, and executed a receipt for the loan, which provided that, if the interest thereon was not paid, it should be added to the principal, and if, owing to nonpayment of interest, the loan should ever equal or exceed the then net reserve value of the policy, the policy should thereupon become null and void. *Held*, that such provision in the receipt for forfeiture of the policy on the contingency therein specified was not a substitute for, and did not abrogate or affect, the provision in the policy for forfeiture for nonpayment of premiums.

2. SAME—CASH SURRENDER VALUE.

A life policy provided that, if it should lapse because of nonpayment of a premium, the cash surrender value, consisting of the amount of the net reserve accrued on the policy, less a surrender charge equal to 1 per cent. of the sum insured, would be paid or applied to the purchase of term or paid-up insurance. The amount of such value for each year was printed on the policy. But, if a loan had been made on the policy, the loan should be paid off out of the "cash surrender value," and the remainder paid in cash, or applied to extended or paid-up insurance, "the amount to be applied to the purchase of such insurance being correspondingly reduced in the ratio of the indebtedness to the full cash surrender value." *Held*, that the terms "cash surrender value" and "full cash surrender value" referred to the same sum, being the amount computed in the manner specified and indorsed on the policy; hence the latter term did not mean the full net reserve without deduction of the surrender charge.

3. SAME—CONDITIONAL DIVIDEND—LAPSED POLICY.

A life insurance company declared a dividend to such participating policies as should be continued in force after their policy anniversaries by payment of renewal premium, and provided that no dividend should

be payable to policies not continued in force after their anniversaries in such year. *Held*, that a policy which lapsed because of nonpayment of the premium thereon for such year was not entitled to such dividend, or to have it applied to extend the insurance.

W. D. Howser and A. R. Gohlson, for plaintiff.
Wm. L. Granbery, for defendant.

CLARK, District Judge. This case involves the liability of the defendant insurance company under a policy for $12,000, issued upon the life of Henry H. Bryant, payable to his wife, Mary L. Bryant. The case has been submitted to the court without the intervention of a jury, principally upon an agreed statement of facts. The plaintiff is the wife of the insured, Henry H. Bryant, and is a citizen of the state of Tennessee. The defendant is an insurance company organized on the mutual plan under the laws of the state of New Jersey. The policy in suit was issued April 18, 1894. The annual premium agreed to be paid was $584.40. Among other things, the policy provided "that, in case the said premium shall not be paid on or before the several days hereinbefore mentioned for the payment thereof at the office of the company in the city of Newark, or to agents when they produce receipts signed by the president or treasurer, then, and in every such case, this policy shall cease and determine, subject to the provisions of the company's nonforfeiture system as indorsed hereon, with accompanying table." The nonforfeiture provisions of the policy read as follows:

"When, after two full annual premiums shall have been paid on this policy, it shall cease or become void solely by the nonpayment of any premium when due, its entire net reserve by the American Experience Mortality, and interest at four per cent. yearly, less any indebtedness to the company on this policy, shall be applied by the company as single premium at the company's rates published and in force at this date, either: First, to the purchase of nonparticipating term insurance for the full amount insured by this policy; or, second, upon the written application by the owner of this policy, and the surrender thereof to the company at Newark within three months from such nonpayment of premium, to the purchase of a nonparticipating paid-up policy, payable at the time this policy would be payable if continued in force. Both kinds of insurance aforesaid will be subject to the same conditions, except as to payment of premiums, as those of this policy. No part, however, of such term insurance shall be due or payable unless satisfactory proofs of death be furnished to the company within one year after death; and, if death shall occur within three years after such nonpayment of premium, and during such term of insurance, there shall be deducted from the amount payable the sum of all the premiums that would have become due on this policy if it had continued in force."

In accordance with the rules of the company permitting it, Henry H. Bryant only paid 80 per cent. of the first premium, and borrowed upon the policy the remaining 20 per cent. When the premium due April 18, 1895, matured, Mr. Bryant again paid 80 per cent. in cash, and borrowed the 20 per cent. from the company, less the dividend allowed for that year, amounting to $107.16. Just prior to the maturity of the premium due April 18, 1896, application was made to the company for an additional loan upon the policy, equal to the maturing premium, which would increase the premium loan

upon the policy to $615.03, after crediting it with the dividend allowed on the policy for that year. In order to loan so large an amount upon the policy, it was necessary that the nonforfeiture provisions should be modified; and accordingly, upon the request and application of Henry H. Bryant and wife, the nonforfeiture provisions above quoted were canceled, and the following substituted therefor in the policy:

"When, after two full annual premiums shall have been paid on this policy, it shall cease or become void solely by the nonpayment of any premium when due, its entire net reserve by the American Experience Mortality, and interest at four per cent. yearly (provided there be no loan on the policy), shall be applied by the company as a single premium at the company's rates published and in force at this date, either: First, to the purchase of nonparticipating term insurance for the full amount insured by this policy; or, second, upon the written application by the owner of this policy, and the surrender thereof to the company at Newark within three months from such nonpayment of premium, to the purchase of a nonparticipating paid-up policy payable at the time this policy would be payable if continued in force. Both kinds of insurance aforesaid will be subject· to the same conditions, except as to payment of premiums, as those of this policy. Third. If preferred, the company will, on surrender of the policy, fully receipted, within the said three months, pay as a cash surrender value its entire net reserve by the American Experience Mortality, and interest at ·four and one-half per cent. yearly, less a surrender charge equal to one per cent. of the sum insured by the policy. If there be any loan on the policy, such indebtedness shall be paid off out of the ·cash surrender value, and the remainder paid in cash by the company; or a value will be allowed by the company in the form of extended or paid-up insurance as above provided, the amount to be applied to the purchase of such insurance being correspondingly reduced in the ratio of the indebtedness to the full cash surrender value."

Appended thereto, and forming a .part of, the new nonforfeiture provision, is a table giving·in figures the cash surrender value and the loan value ·at the end of each year ·from the time the policy was issued. The loan value under the original nonforfeiture provisions was only one-half the 4 per cent. reserve. Under the new or modified nonforfeiture provisions the loan value was exactly equal to the "cash surrender value." At the end of the fifth policy year the loan value under the original nonforfeiture provisions was only $696, and under the new nonforfeiture provisions was $1,214.88. After the substitution of the nonforfeiture provisions, as above set out, the company loaned upon the policy the entire premium maturing April 18, 1896, which increased the loan on the policy to $615.03,. after. crediting all dividends allowed to that date, and Mr. Bryant executed therefor a certificate of loan, reading as follows:

"$615.03.    Newark, N. J., April 18, 1896.

"This certifies that the Mutual Benefit Life Insurance Company has loaned on policy No. 202,500 six hundred and fifteen and $^{03}/_{100}$ dollars, being a 'part of the premiums on said policy, which, with any additional loan, shall be a lien on the policy until paid; legal interest on the same to be payable annually, the amount of· the existing loan to be indorsed hereon, and stated also on the renewal receipt. It is understood and agreed that, if interest shall not be paid when due, either in cash or. by dividend, it shall be added to the principal of the loan, and that if, owing to the nonpayment of interest, the principal of the loan shall ever equal or exceed the then net reserve value of the policy, computed according to the American

Experience Table of Mortality, and 4 per cent. interest, the policy shall thereupon become null, void, and be surrendered to the company in consideration of the cancellation of the loan.

"[Signed]                                                        Henry H. Bryant."

When the premium due April 18, 1897, matured, Mr. Bryant paid to the company in cash the sum of $236.44, and increased his premium loan to $885.05; and on April 18, 1898, Mr. Bryant paid on the premium then maturing the sum of $257.64 in cash, and increased his premium loan to $1,146.11. Each time the loan on the policy was increased, the amount of the increase was stated on the back of the certificate of loan. Dividends were allowed upon the policy each year, beginning April 18, 1895, and ending April 18, 1898, and amounting in the aggregate to $451.80. And, while the policy called for the payment of $2,922 in the aggregate for premiums maturing from April 18, 1894, to April 18, 1899, there was only paid the sum of $1,429.12, or an average of $285.82 per annum, the remainder of the premiums for those years being paid in dividends and loans upon the policy. On January 23, 1899, the board of directors of the defendant company passed the following resolution:

"Resolved, that the sum of $1,959,880.93 be, and hereby is, appropriated to the payment of dividends for the year 1898–1899 to participating policies as the same shall be continued in force after their policy anniversaries by payment of renewal premium, or by their being paid-up policies. No dividend shall be payable to policies not continued in force after their anniversaries in 1899, except post mortem dividends, as heretofore."

Prior to April 18, 1899, the date upon which the next annual premium matured, Henry H. Bryant was given notice of the maturity of the premium, which also stated that a dividend of $123 would be allowed, provided the premium then maturing was paid. On March 15, 1899, Mr. Bryant wrote to the company as follows:

"Mr. Amzi Dodd, Newark, N. J.: Please write me an exact statement of my indebtedness to your company after being credited with all dividends to date.

"Yours, respectfully,                                    Henry H. Bryant."

And in reply received the following letter:

"March 18, 1899.

"Mr. Henry H. Bryant, 216 Main St., Clarksville, Tenn.: In reply to yours of the 15th inst. we would say that in case of your policy No. 202,500 premiums are paid up to April 18th prox., and the policy is subject to a premium loan indebtedness of $1,146.11, with interest from April 18th, 1898.

"Yours, truly,                          B. J. Miller, Mathematician."

And on April 15, 1899, he again wrote the company as follows:

"Mr. B. J. Miller, Mathematician: I mail to you under separate cover my policy No. 202,500, properly signed, for which please mail me as soon as possible check for my full surrender value in cash, $1,396.08, less my loan and interest, $1,214.87, which, according to the policy and your letter of March 18th, leaves a balance due me of $181.21. Further correspondence over this matter will be entirely unnecessary, as I have fully decided to drop policy, so by complying with the above request you will greatly oblige me. Thanking you kindly for past favors, I am

"Yours, very truly,                                    Henry H. Bryant."

And in reply received the following letter:

"Newark, N. J., April 21, 1899.

"Mr. Henry H. Bryant, Clarksville, Tenn.: Yours of the 15th inst. is received, together with policy No. 202,500 on your life, forwarded by you for its cash surrender value. The premium due the 18th inst. not having been paid, the present cash surrender value of the policy as given in the nonforfeiture statement appended thereto is $1,214.88. As stated in ours of 18th ult., the policy is subject to a premium loan of $1,146.11, with interest from April 18, 1898. It requires the entire cash surrender value of the policy as above, $1,214.88, to pay off this premium loan with accrued interest, and the policy has, therefore, no net value for surrender of any kind. We return the policy herewith. If you should choose to forward the policy to this office, with the inclosed receipt signed by you and Mrs. Mary L. Bryant, we will return your premium loan certificate.

"B. J. Miller, Mathematician."

No part of the premium maturing April 18, 1899, was paid, and no premium upon the policy was paid after April 18, 1898. There was no correspondence or other communication between Mr. Bryant and the company after the letter of April 21, 1899. He was accidentally killed on November 25, 1899, or 222 days after the nonpayment of the premium maturing on April 18, 1899. The net reserve on the policy in suit on April 18, 1899, according to the American Experience Mortality, with 4 per cent. interest, was $1,-396.08; and, according to the American Experience Mortality, with interest at $4\frac{1}{2}$ per cent., was $1,334.88. Mr. Bryant's age on April 18, 1899, was 56 years, and any extended insurance to which he would have been entitled—if any, at that date—under the company's published rates would have been purchasable at the rate of $22.94 per $1,000 per annum, and $0.7536 would have extended the $12,000 policy one day. The loan on the policy April 18, 1899, was $1,214.88, including interest, and its cash surrender value on that date was exactly the same amount. On April 10, 1899, Mr. Bryant procured to be issued upon his life a policy of insurance for the sum of $10,000 in another company, and just prior to the acceptance of the policy in suit he allowed a policy of $10,000 in still another company to become forfeited for nonpayment of premiums. The plaintiff's suit is for the full amount of the policy, with interest from the time of the insured's death, the company having declined to recognize any liability under the policy. The defenses are the general issue and special pleas setting up the nonpayment of the premium and the forfeiture of the policy therefor prior to the death of Mr. Bryant.

1. The first contention of the plaintiff is that the policy sued on was changed or modified by language found in the last premium loan certificate, which reads as follows:

"It is understood and agreed that, if interest shall not be paid when due, either in cash or by dividend, it shall be added to the principal of the loan; and that if, owing to the nonpayment of interest, the principal of the loan shall equal or exceed the then net reserve value of the policy, computed according to the American Experience Table of Mortality, and four per cent. interest, the policy shall thereupon become null, void, and be surrendered to the company in consideration of the cancellation of the loan."

The policy provides that, in case the premiums shall not be paid on or before the several days mentioned for the payment thereof, then the policy shall cease and determine, subject to the provisions of the company's nonforfeiture system. The language quoted from the certificate of loan provides for the forfeiture of the policy in certain events, regardless of whether the premiums be paid or not. The loan on the policy never equaled or exceeded the 4 per cent. reserve, and therefore we have no such case as would be presented had that contingency arisen. The case we are dealing with arises under a failure to pay the premium maturing April 18, 1899, and therefore the rights of the parties must be determined under the language of the policy providing for the contingency of nonpayment of the premium when due, and not under the language of the loan certificate providing for the contingency in which the loan equals or exceeds the reserve at 4 per cent., without any reference whatever to the payment or nonpayment of the premiums. If the construction contended for by plaintiff be the correct one, then the nonpayment of the premiums would never render the contract void or terminated so long as the insured made payments of interest on the loan sufficient in amount to prevent the loan and interest equaling or exceeding the 4 per cent. reserve. I cannot possibly bring myself to believe that such a change in the contract was intended to be made, or that it was understood to have been made by the statement found in a mere receipt or certificate like the one in question, in the absence of any statement or language whatever suggesting a change in the contract, or expressing a desire or intention to make any change or modification in the policy, and especially when the effect of such a change would be so disastrous to one of the contracting parties. If there had been an intention to so change the deliberately and carefully executed contract, it is impossible to think that the purpose to do so would not, in some form of language, have been appropriately expressed. In the absence of an express declaration of purpose to change the contract, the conclusion that a change has been made by implication ought to rest upon very clear ground.

2. The next contention of the plaintiff is that under the terms of the nonforfeiture provisions as found in the policy, without reference to the certificate of loan, the insurance contract was extended beyond the death of Mr. Bryant, and that this was done automatically, so to speak, without any direction from the assured in that regard, or the expression of any choice from him. In considering this view of the case, it is necessary to bear in mind that the failure to pay the annual premium due in April, 1899, was deliberate and intentional upon the part of the assured, as he had distinctly declared his purpose to drop the policy just before that premium matured, and gave the company notice that it would be useless to argue the question with him; and his unalterable determination to do so is probably explained by the fact that he had just procured upon his life a policy of insurance for the sum of $10,000 in another company. It is not necessary to refer to the original nonforfeiture provisions in the policy, since they were, by

109 F.—48

consent, changed in 1896. Nor is it necessary to discuss any other feature of the nonforfeiture provisions, except that part dealing with a case in which there is a loan on the policy, since the first, second, and third provisions relate solely to cases in which there is no loan on the policy. There was a loan on the policy in this case, and it is therefore proper to deal alone with that particular provision of the nonforfeiture system which provides:

"If there be any loan on the policy, such indebtedness shall be paid off out of the cash surrender value, and the remainder paid in cash by the company; or a value will be allowed by the company in the form of extended or paid-up insurance as above provided, the amount to be applied to the purchase of such insurance being correspondingly reduced in the ratio of the indebtedness to the full cash surrender value."

There is here no reference to any reserve, either on a 4 per cent. or $4\frac{1}{2}$ per cent. basis, but only to a cash surrender value, which has been definitely computed and fixed for the end of each policy year in the table appended to and forming part of the nonforfeiture provisions. It must also be observed that under this clause in the policy the assured is given the choice of three modes of settlement when the policy ceases or becomes void solely for the nonpayment of a premium, in case there is a loan on the policy: First, the assured may accept the cash surrender value, after deducting therefrom the amount of the loan; or, second, the company will issue a policy for paid-up insurance upon application; and, third, the policy will be automatically extended in the form of extended insurance if neither of the other two settlements is requested by the policy holder. In the event the policy holder desires the remainder of the cash surrender value paid in cash, or desires a policy for paid-up insurance, he must, within three months from the nonpayment of the premium, surrender his policy, and receive in cash the remainder of the cash surrender value, or receive a paid-up policy. In the event he does neither, then the original policy is extended for such a length of time as is provided for in the policy. In this case there is no pretense (leaving out of view the letter of Mr. Bryant to the company just after the nonpayment of the April, 1899, premium, in which he demanded the cash surrender value) that the policy was surrendered, and the remainder of the cash surrender value, after the payment of the indebtedness, paid to Mr. Bryant, nor that he surrendered his policy, and procured in lieu thereof a policy of paid-up insurance. The contention of the plaintiff is that the original policy was extended automatically for such length of time as the amount allowed by the company for the purchase of extended insurance under the terms of the policy would purchase; and it is only this feature of the nonforfeiture provision above quoted which need be considered. For the plaintiff it is conceded that the amount to be applied to the purchase of extended insurance should be reduced in the ratio of the indebtedness to the full cash surrender value, but it is insisted that the "full cash surrender value" means the full reserve at $4\frac{1}{2}$ per cent. interest, in contradistinction to what is meant by "cash surrender value," estimated on the basis of the $4\frac{1}{2}$ per cent. reserve, less 1 per cent. of the face of the policy;

and that in this way the loan being only $1,214.88, and the reserve at 4½ per cent. being $1,334.88, the indebtedness was only about 90 per cent. of the full cash surrender value, which leaves 10 per cent. of the reserve at 4 per cent., with which to purchase extended insurance at $0.7536 per day; and that this would extend the policy 166 days from April 18, 1899. The contention of the defendant is that there is no distinction between "cash surrender value" and "full cash surrender value"; that there is but one cash surrender value mentioned in the policy, and that there can be no controversy as to the amount of the cash surrender value of the policy at the end of its fifth year, since the table states the amount to be $1,214.88; and that, when the indebtedness was deducted from the cash surrender value, it left no per cent. whatever of the 4 per cent. reserve to be applied to the purchase of extended insurance, for the reason that the 100 per cent. of the cash surrender value was used in paying the indebtedness on the policy, and therefore the 4 per cent. reserve was correspondingly reduced, to wit, 100 per cent. The contention of the defendant is illustrated by assuming a case where the loan was only 50 per cent. of the cash surrender value. In that event the 4 per cent. reserve would be correspondingly reduced, which would leave 50 per cent. of the 4 per cent. reserve with which to purchase extended insurance; and that, if the indebtedness or loan was 75 per cent. of the cash surrender value, the 4 per cent. reserve would be reduced 75 per cent., which would leave only 25 per cent. of the 4 per cent. reserve with which to purchase extended insurance; but that in this case, as the indebtedness was exactly equal to the cash surrender value, the 4 per cent. reserve was correspondingly reduced the 100 per cent., which left nothing whatever with which to purchase extended insurance. And the defendant further insists that the reason the words "full cash surrender value" were used in the language above quoted was to make it plain that the ratio of indebtedness to cash surrender value meant the ratio of indebtedness to the entire or 100 per cent. of the cash surrender value, and did not in any sense intend to create a different cash surrender value from the amount computed and stated in figures in the table. The contentions of the defendant upon this point seem to be well taken, since I cannot see any reason why there should be two cash surrender values on the same policy at the same time; and the language would have to be very plain and explicit in order for such a construction to be maintained. The cash surrender value being stated in figures, it seems to me that these figures control, whether it be spoken of as a "cash surrender value" or a "full cash surrender value," and that the table appended to the nonforfeiture provisions is conclusive of this question. However, it is unnecessary for the court to discuss this question more fully, since it is conceded by the plaintiff's counsel that her contention upon this point alone will not extend the policy beyond the death of Mr. Bryant, and that she must also maintain her contention upon the next question to be considered, and in view of the holding of the court upon this question.

3. The plaintiff insists that she is entitled to have the condition-

ally declared dividend for the year 1899 applied in reduction of
the loan on the policy. The resolution declaring the dividend made
the right of the policy holder thereto depend upon the payment
of the renewal premium falling due in 1899. No particular date
when the dividend should become due was fixed by the resolution,
and no notice of the declaration of a dividend was given to the
plaintiff, as the stipulation shows; and obviously the directors
thought that such a dividend could not be declared in that year,
except on the basis that the premiums due for the same year, and
at the same time, were paid into the treasury of the company. The
directors may have and probably did see, in view of the known con-
dition of the company, that, if dividends were declared and paid
out of the treasury for the same year that premiums were accru-
ing, and the premiums should not be paid, the company would be in-
volved in trouble, while with the prompt payment of all the pre-
miums the dividend could be safely declared without difficulty for
the then next ensuing year. I have examined the text-books and
cases referred to by plaintiff's counsel upon this question, but they
are all cases of ordinary stock corporations, and in cases where
the dividends have been unconditionally, fully, and completely de-
clared, and the fund with which to pay the same set apart, with
notice to the stockholder, so that his right to the dividend be-
came vested, in which cases it was, of course, held that his fixed
right could not be devested by subsequent action of the directors;
and, if we were to assume that the doctrine of these cases is ap-
plicable to a contract of mutual insurance like the one here in
question, it still remains that such action as was taken by the
directors in this case did not constitute a fully and uncondition-
ally declared dividend, and the plaintiff's right thereto did not at
any time become vested, so that he could have sued the company
therefor. A resolution declaring a dividend can be canceled before
the date for the payment of the dividend has arrived, and before
any notice has been given to the stockholders of the declaration
of the dividend. Ford v. Thread Co., 158 Mass. 84, 32 N. E. 1036,
20 L. R. A. 65, 35 Am. St. Rep. 462. And, if the resolution might
be rescinded, I perceive no reason why it might not be conditional.
On the contrary, in a contract like the one in question, I have no
doubt of the right of the company to make the policy holder's claim
to a dividend for any year depend upon the prompt payment of his
premium; and a decision which would hold otherwise could not
be respected as sound or just, however much we might yield to it
if pronounced by a revising court, in which case it would be our
duty to respect it as a matter of authority, but not otherwise. The
declaration of dividends belongs exclusively to the board of direc-
tors, and until their action has been impeached by some proper
proceeding the terms and conditions of the declaration of dividends
must be accepted by the courts as determined by the board of direc-
tors, giving full force and effect to their action. Therefore, as the
assured deliberately and intentionally refused to pay the premium
due on the 18th of April, 1899, and allowed the policy to lapse, I
conclude that he was not entitled to this dividend; and, further-

more, I conclude that, as the contract of assurance expressly fixes the "cash surrender value" of the policy, that the assured is bound by this, and that the company is entitled, under its contract, to have the 4 per cent. reserve reduced in the ratio of the indebtedness to the cash surrender value in ascertaining the amount to be applied to the purchase of extended insurance.

The result is that the plaintiff cannot succeed in her contentions, namely, a different cash surrender value from that stated in the policy, nor in her claim to the dividend conditionally declared by the directors of the defendant company. I have been quite willing to see the plaintiff recover in this case, provided it could be done consistently with a fair and just interpretation and enforcement of the contract; but, after a careful study of it in all of its provisions, I am unable to see that the policy was continued in force beyond April 18, 1899, the date upon which the insured deliberately and intentionally refused to pay his premium upon the policy; and I therefore conclude that the plaintiff is not entitled to recover upon the policy, either for the full amount insured or for any other sum.

The testimony of Mrs. Bryant, in so far as it undertakes to give the intention of Mr. Bryant in respect to the policy, confided to her alone, and after the lapse of the policy, is not competent, and I therefore exclude it; but, if it were admitted, it would not change my view of the contract, nor the result of this suit. According to her testimony, Mr. Bryant, in a private conversation with her, did not insist or assume that his policy was continued in force after April 18, 1899, nor that, in the event of his death before the following spring, she would be entitled to recover the amount of the policy. All he said to her, in substance, was that the policy would be worth a great deal to her. It would probably be strictly correct to hold, on the stipulation and correspondence in this case, that the deceased simply dropped his policy, and called for a cash surrender settlement, and, when confronted with the fact that there was no cash remainder to be paid to him under such settlement, that the contract was thereafter treated as abandoned and ended by both the contracting parties. In ruling on the case, however, I have treated the policy as one forfeited by the nonpayment of the April, 1899, premium. I have said that the plaintiff is not entitled to recover upon the policy on the theory that it was not extended and in force at the time of the death of the assured, since any value or amount which would have been coming to the plaintiff would not have been sufficient to have extended the policy until the date of his death, without the addition of the dividend, even upon the plaintiff's own interpretation of the policy, and upon the plaintiff's own figures. Assuming that there was any sum coming to the plaintiff, it was exhausted by an automatic extension of the policy to a date prior to the date of Mr. Bryant's death, and it is not necessary for me to definitely decide how long it was extended, if at all, as I do not regard the question as here involved; nor do I decide whether or not any sum was due the plaintiff, since she has clearly failed to establish that the policy was in force at the

time of the death of her husband. I simply decide that there is no theory of settlement which the plaintiff can rightly claim which would extend the life of this policy until the death of the insured, and therefore she is not entitled to recover in this case. If any additional finding of fact is thought necessary by the plaintiff in order properly to review this case, such finding can be drawn up in due form, and submitted to adversary counsel, and then forwarded to me for approval, or, in case of disagreement, for the settlement of any disputed points. It will, perhaps, also be necessary for the plaintiff, in order to revise the judgment, to take exception to the conclusions at which the court arrives, which exceptions are now allowed. Judgment will be entered for the defendant.